IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

LEE HUNT, as Personal Representative of
the Wrongful Death Estate of Ariza Barreras
and GABRIELLE VALDEZ, as Guardian Ad
Litem for T.B. and F.B., minor children,

      Plaintiffs,

v.                                          Case No. 1:19-cv-00700-KWR-KRS

STEPHANIE CROWNOVER, in her personal
Capacity acting under color of state law;
LEAH MONTANO, in her personal capacity
acting under color of state law; GWENDOLYN
GRIFFIN, in her personal capacity acting under
color of state law; of state law; KIM CHAVEZ-BUIE,
in her personal capacity acting under color of state
law; MICHELLE HILL, in her personal capacity
acting under color of state law; LORA VALDEZ,
in her personal capacity acting under color of
state law; and THE NEW MEXICO CHILDREN,
YOUTH AND FAMILIES DEPARTMENT,

      Defendants.

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION
FOR JUDGMENT ON THE PLEADINGS ON THE BASIS
OF FAILURE TO STATE A CLAIM AND QUALIFIED IMMUNITY**

      Viewing Plaintiffs' amended complaint in only the most general manner, the Individual

Defendants ask this Court to rule that a 53-page complaint containing over 170 detailed

paragraphs fails to contain sufficient facts to state a plausible claim for relief. Defendants'

motion is without merit. Defendants' truncated recitation of the factual allegations misstates or

ignores essential facts which, when assumed to be true, clearly raise Plaintiffs' right to relief

beyond the speculative level. The substance of the factual allegations demonstrates that

Defendants are liable for the misconduct alleged. Given the breadth and the specificity of

Plaintiffs' factual allegations, Plaintiffs' complaint more than satisfies the pleading standard required at this nascent stage of the litigation.  As a result, the Court should deny the Individual Defendants' motion to dismiss.

## I.   DEFENDANTS' STATEMENT OF THE STANDARD FOR PROPER CONSIDERATION OF A MOTION TO DISMISS IS INCOMPLETE.

Defendants' motion parrots the proper language, and cites the correct cases, in stating the standard to be used in measuring the sufficiency of Plaintiffs' complaint.  (*See* Defs.' Mot. at 3-4.)  However, Defendants omit three key factors that are essential in this Court's determination.

First, the operative pleading standard is set forth in Rule 8(a)(2) of the Federal Rules of Civil Procedure, which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  The Supreme Court's rulings in *Bell. Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), did not obviate this Rule in favor of a heightened pleading standard.  As the Tenth Circuit noted in *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012), "Rule 8(a)(2) still lives [and] [t]here is no indication the Supreme Court intended a return to the more stringent pre-Rule 8 pleading requirements."  In a case decided by the Supreme Court immediately following its decision in *Twombly*, the Court in *Erickson v. Pardus,* 551 U.S. 89, 93 (2007), made clear that "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  "Only if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 323 (2007) (citation omitted).

Second, at this early stage, the "court's function . . . is not to weigh potential evidence that the parties might present at trial" but to determine whether the complaint "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Brokers'*

*Choice of Am., Inc. v. NBC Universal, Inc.*, 757 F.3d 1125, 1135-36 (10th Cir. 2014) (internal quotation marks & citations omitted).   As a corollary to this rule, "the defendant cannot, in presenting its 12(b)(6) challenge, attempt to refute the complaint or to present a different set of allegations. The attack is on the sufficiency of the complaint, and the defendant cannot set or alter the terms of the dispute." *Gomez v. Ill. State Bd. of Educ.*, 811 F.2d 1030, 1039 (7th Cir. 1987); *see also Sanner v. Chicago Bd. of Trade,* 62 F.3d 918, 925 (7th Cir. 1995) (in pursuing a motion to dismiss, a defendant cannot refute the complaint or present a different set of allegations more favorable to his position).   The Court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to Plaintiffs, and draw all inferences in their favor.  *See Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010); *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009).

And finally,  if this Court believes that potential defects in a complaint may be remedied, it should grant leave to amend, rather than dismiss the claim.  *See, e.g., Travelers Indem. Co. v. Dammann & Co., Inc.*, 594 F.3d 238, 256 n.14 (3d Cir. 2010) ("[I]f a complaint is vulnerable to Rule 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile.  That rule applies even if the plaintiff does not seek leave to amend.") (internal quotation marks & citations omitted); *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc) ("[W]e have repeatedly held that a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not be cured by the allegation of other facts.") (internal quotation marks omitted).  *Cf. Ashcroft*, 556 U.S. at 687 (remanding to permit lower court to consider future request for "leave to amend . . . deficient complaint.").

## II.   THE INDIVIDUAL DEFENDANTS DO NOT CHALLENGE THAT PLAINTIFFS' ALLEGED CONSTITUTIONAL RIGHT WAS CLEARLY ESTABLISHED.

When a defendant asserts the defense of qualified immunity, "the onus is on the plaintiff to demonstrate '(1) that the official violated a statutory or constitutional right, *and* (2) that the right was "clearly established" at the time of the challenged conduct.'"  *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011)).  A right is clearly established if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Pauly v. White*, 814 F.3d 1060, 1074 (10th Cir. 2016).

In their motion to dismiss, the Individual Defendants never contend that the substantive due process right at issue was not clearly established.  They do not argue that they were not state actors subject to the federal Civil Rights Act, 42 U.S.C. § 1983.  (*See* Defs.' Mot. at 9-10 & 20.) They nowhere challenge that Ariza Barreras, T.B. and F.B. were within the physical and legal custody of the State of New Mexico.  (*Id.* at 41.)  And they cite numerous Supreme Court and Tenth Circuit cases decided years before the operative dates in the present case that established that children in the physical and legal custody of the State – like the three Plaintiffs here – had a constitutional right not to be subjected to an unsafe environment in which they were vulnerable to physical and/or emotional neglect or abuse.  (*Id.* at 6-10.)  The present motion for qualified immunity thus is not based on the absence of clearly established law, but instead, rests solely on the argument that the Individual Defendants did not violate Plaintiffs' constitutional rights. Viewing the totality of the allegations in the light most favorable to Plaintiffs, that argument is incorrect.

III.   **PLAINTIFFS' AMENDED COMPLAINT SUFFICIENTLY ALLEGES THAT THE INDIVIDUAL DEFENDANTS VIOLATED PLAINTIFFS' SUBSTANTIVE DUE PROCESS RIGHTS WHEN THE STATE HAD A SPECIAL RELATIONSHIP WITH ARIZA BARRERAS, T.B. AND F.B.**

In *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), the Supreme Court made clear that the Due Process Clause does not ordinarily obligate the state to protect its citizens from private violence and thus does not provide a basis for suing state-employed social workers who merely "st[and] by and d[o] nothing when suspicious circumstances dictate[] a more active role for them." *Id.* at 203.  But the Court emphasized that the state *does* owe a constitutional duty of protection to persons with whom it has a "special relationship," such as prisoners and other individuals in state custody.   The Court thus acknowledged that "[h]ad the State by affirmative exercise of its power removed Joshua from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect." *Id.* at 201 n.9.

As summarized by the Tenth Circuit in *Matthews v. Bergdorf*, 889 F.3d 1136, 1143-44 (10th Cir. 2018), in order to state a claim under the special relationship doctrine,

> [t]he complaint first must plead the existence of a special relationship between the plaintiff and the State. . . .   Second, the complaint must allege facts showing the responsible state actor knew the plaintiff was in danger or failed to exercise professional judgment regarding such danger. Third, the plaintiff must plead facts establishing the state actor's conduct caused plaintiff's injuries.  Fourth, plaintiff must plead facts tending to shock the conscience.

(citing *Dahn v. Amedei*, 867 F.3d 1178, 1185-86 (10th Cir. 2017).)  Viewing the totality of the allegations in the light most favorable to Plaintiffs, and with all inferences drawn in Plaintiffs' favor, leaves no doubt that the complaint states a plausible claim for relief against the Individual Defendants.

A.      **The State Had A Special, Custodial, Relationship With Plaintiffs**

The special relationship doctrine "protects individuals who involuntarily enter state custody and subsequently become reliant on the State, through its agencies and officials, to provide their basic human needs, paramount among those safety." *Schwartz v. Booker*, 702 F.3d 573, 585 (10th Cir. 2012).   "[F]oster care is recognized as one of the custodial relationships that creates a special relationship." *Id.* at 580. *See DeAnzona v. City & Cty. Of Denver*, 222 F.3d 1229, 1234 (10th Cir. 2000) (a State's affirmative act of placing a child in involuntary foster care is a restraint on liberty triggering constitutional protection under the special relationship exception). *See also Norfleet ex rel. Norfleet v. Ark. Dep't of Human Servs.*, 989 F.2d 289, 293 (8th Cir. 1993)("In foster care, a child loses his freedom and ability to make decisions about his own welfare, and must rely on the state to take care of his needs").

Plaintiffs' Complaint unequivocally states that in May 2017, Ariza Barreras, T.B. and F.B. were removed from their biological parents and placed in the legal and physical custody of CYFD.  (Am. Compl. ¶¶ 18 & 36.)  These actions effectively removed the children from "the free world," *DeShaney*, 489 U.S. at 201 – from the household of their own parents – and demonstrated the State's determination to maintain them in an alternative environment of its choosing.  In fact, "[g]iven their young age, once they had been removed from the custody of their biological parents and were within the State of New Mexico's legal custody and physical control, Ariza Barreras, T.B. and F.B. were wholly dependent for their basic human needs such as food, shelter, clothing, personal care, medical care, safety and welfare on the care-givers selected for them by the State of New Mexico."  (Am. Compl. ¶¶ 106 & 126.)  Based on these clear factual assertions, a special relationship existed between all three children and the State of New Mexico.

**B.      The Individual Defendants Knew Plaintiffs Were In Danger Or Failed To Exercise Professional Judgment Regarding Such Danger**

The existence of a special relationship between the state and a foster child "triggers a continuing duty which is subsequently violated if a state official 'knew of the asserted danger to [a foster child] or failed to exercise professional judgment with respect thereto" *Schwartz*, 702 F.3d at 580 (quoting *Yvonne L. v. New Mexico Department of Human Services*, 959 F.2d 883, 890 (10th Cir. 1992) (alterations in original).   Plaintiffs' complaint contains sufficient factual detail to satisfy these elements of their claim for relief.

**1.      The Individual Defendants Knew Plaintiffs Were In Danger.**

The Individual Defendants state that "Plaintiffs fail to assert any allegations to show that any moving Defendant knew that Ariza, T.B or F.B. were in danger of being harmed by anyone." (Defs.' Mot. at 21.)   To the contrary, the complaint lays out in detail the information known to these Defendants that showed the potential for significant harm at the hands of the foster parents licensed and selected by the State.   Contrary to Defendants' narrow view, as foster children, Plaintiffs have a right to be free not just from actual harm, but also from an unreasonable risk of harm while in the State's care.  *See M.D. ex rel. Stukenberg v. Perry*, 294 F.R.D. 7, 34 (S.D. Tex. 2013) ("[T]he fourteenth amendment right upon which plaintiffs base their claim can be characterized as a right to be free from an unreasonable risk of harm while in the state's custody.")

Each of the Individual Defendants knew of the potential danger in placing Plaintiffs with Vanessa Dominguez and Justin Romero as foster parents.   These individuals only wanted to serve as respite care foster parents.   They indicated this limitation on the application for a foster parent license (Am. Compl. ¶ 20).   And in overturning the recommendation of the home-study investigator, Defendants Montano, Griffin and Chavez-Buie noted that "Justin and Vanessa

would just like to be respite providers." (*Id.* ¶ 26.)  Moreover, the only license issued by CYFD and signed by Defendant Griffin states that it is for only a respite home.  (*Id.* ¶¶ 27-28 & 38.) Nonetheless, Defendants Hill and Valdez made the decision to place Plaintiffs – two of whom should have been classified as "special needs" children (*id.* ¶ 19) – in the full-time care of these respite foster parents.  (*Id.* ¶ 37.)  For the Individual Defendants now to claim that they were unaware of the potential danger that could befall these infant children placed in the exclusive care of foster parents who expressly said that they did not want that responsibility ignores the actual knowledge that these Defendants possessed.

Similarly, Defendants Montano and Griffin knew of the potential danger Crownover posed as Plaintiffs' state-licensed respite care foster parents.  These Defendants conducted the home study of Crownover when she applied to be a respite foster care parent. (*Id.* ¶ 32.)  As a result, they had personal knowledge that Crownover had (i) severe financial constraints, (ii) an extensive criminal history, (iii) admitted a history of alcohol and drug abuse, and (iv) a history of substantiated allegations of abuse with her own family members.  (*Id.* ¶ 31.)  They also were aware that her home lacked necessary bedding.  (*Id.*)  Despite this knowledge, Defendant Montano facilitated and approved Crownover's role as a respite care foster worker for Plaintiffs. (*Id.* ¶¶ 44-45.)  Defendant Montano also was aware that Vanessa and Justin were utilizing Crownover without following CYFD's policies and procedures.  (*Id.* ¶ 48.)  Most disturbingly, Defendant Montano had knowledge that, based on her past experience with the children, Crownover unequivocally stated that she was not willing to care for all three Plaintiffs at the same time.  (*Id.* ¶ 51.)  These Individual Defendants clearly knew that Crownover should not and could not provide respite care for Plaintiffs.  It is more than plausible that, with that level of knowledge, these Individual Defendants knew that Plaintiffs would be in danger if they were

placed together with Crownover.  *See Ashcroft*, 556 U.S. at 678 ("A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged.).

At the very least, these allegations "give the court reason to believe that [these Plaintiffs have] a reasonable likelihood of mustering factual support for these claims."  *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).  In that regard, discovery will directly address several of the issues raised by the Individual Defendants in support of their motion.  For example:

- Defendants claim they had no "knowledge that any of the children were ever in danger while they were in foster care" (Defs.' Mot. at 22), and that "Plaintiffs fail to show that any moving Defendant knew that Ariza was in imminent danger of dying while in Crownover's care."  (*Id.* at 23.)  Yet the factual allegations show that, within 24 hours after Ariza's death, CYFD investigators found, based on "sufficient, credible, reasonable believable information" that "[a] household member has previously abused or neglected a child(ren), and the severity of the maltreatment, or the caregiver(s) response to the prior incident, places the child(ren) in present or impending danger of serious harm; and [the household environment or living conditions place the child(ren) in present or impending danger of serious harm."  (Am. Compl. ¶ 74.)  If CYFD investigators could identify these dangers less than a day after the children were harmed, then discovery will determine if that same information was known to the Individual Defendants with personal involvement in allowing and overseeing Crownover's respite care, thus demonstrating that, in fact, they knew of the danger to Plaintiffs.

- Plaintiffs made detailed allegations pertaining to documentation in the CYFD file from the children's' visitation monitor two days before Ariza's death concerning the disturbing condition of the children while in Crownover's care.  (*Id.* ¶ 62.) This documentation – showing that the children were dirty and displayed diaper rash – would be consistent with the conditions found by law enforcement who investigated the Crownover home after Ariza's death.  (*Id.* ¶¶ 69-70.)  Defendants dismiss these allegations on the grounds that "there are no facts to show that any of the Individual Defendants had knowledge of that report."  (Defs.' Mot. at 22.) Discovery will flesh out whether, in fact, any of the Individual Defendants were aware of this report or the decrepit condition of the Crownover home before December 28, 2017.  Such awareness would further demonstrate their knowledge of the danger facing Plaintiffs in the Crownover foster home.

**2.      The Individual Defendants Failed To Exercise Professional Judgment With Regard To Such Danger**

Rather than mere negligence, "liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such judgment."  *Youngberg v. Romero*, 457 U.S. 307, 323 (1982).  The complaint makes just such a plausible showing based on specific factual allegations related to each Individual Defendant.

As an initial matter, Defendants seek to parse the pertinent course of events into discrete, unrelated segments and then micro-analyze each fragment in an effort to show that they did not breach any professional duty.  (*See* Defs.' Mot. at 23.)  This type of constricted focus is not the proper lens by which to measure the appropriateness of these state actors' challenged conduct. Instead, the proper analysis views the defendant's "conduct as whole."  *Uhlrig*, 64 F.3d at 576;

*Schwartz*, 702 F.3d at 586 ("Viewing [social workers'] conduct 'in total'").  But even using the truncated form of inquiry laid out in Defendants' motion, the conclusion is clear that Plaintiffs' allegations suffice to establish this element of their claim for relief.

> **a.   Licensure Approval of the Dominguez/Romero Foster Home**

The Individual Defendants repeatedly assert that Defendants Montano, Griffin and Chavez-Buie conducted an "investigation" to approve Vanessa Dominguez and Justin Romero as foster parents, and that their decision to license the foster home thus was an appropriate exercise of their collective professional judgment.  Defendants' attempt to recast Plaintiffs' allegations to suit their argument is entirely misplaced.

In ruling on Defendants' motion, the Court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to Plaintiffs, and draw all inferences in their favor.  *See Casanova*, 595 F.3d at 1124; *Smith*, 561 F.3d at 1098.  At this early stage, the "court's function . . . is not to weigh potential evidence that the parties might present at trial" but to determine whether the complaint "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Brokers' Choice of Am., Inc.*, 757 F.3d at 1135-36 (internal quotation marks & citations omitted).  As a corollary to this rule, "the defendant cannot, in presenting its 12(b)(6) challenge, attempt to refute the complaint or to present a different set of allegations. The attack is on the sufficiency of the complaint, and the defendant cannot set or alter the terms of the dispute." *Gomez v. Ill. State Bd. of Educ.*, 811 F.2d 1030, 1039 (7th Cir. 1987); *see also Sanner v. Chicago Bd. of Trade,* 62 F.3d 918, 925 (7th Cir. 1995) (in pursuing a motion to dismiss, a defendant cannot refute the complaint or present a different set of allegations more favorable to his position).

Defendants disregard this directive.  Instead, they base much of their argument on factual assertions either not found in the complaint or directly contrary to Plaintiffs' well-pled factual allegations.  The Court cannot consider Defendants' factual claims for the purpose of ruling on their motions to dismiss.  *Asghari v. Volkswagen Group of Am., Inc.*, 42 F. Supp. 3d 1306, 1320 (C.D. Cal. 2013); *see Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (explaining "the general rule that courts, when ruling on a motion to dismiss, must disregard facts that are not alleged on the face of the complaint or contained in documents attached to the complaint").

In the complaint, Plaintiffs allege that CYFD selected an independent agency to conduct the only home study of Vanessa Dominguez and Justin Romero.  (Am. Compl. ¶ 21.)  Neither CYFD nor any of the Individual Defendants performed a separate home study.  (*Id.* ¶ 22.)  That 18-page home study was exhaustive and was based, at least in part, on interviews with both Vanessa and Justin.  (*Id.* ¶ 23.)  Based on that study and the concerns that it raised, the agency recommended Vanessa and Justin be denied a foster home license.  (*Id.* ¶ 24.)  But as Plaintiffs expressly allege:

> Despite the facts revealed in the 18-page home study which recommended that Vanessa Dominguez and Justin Romero be denied for a foster parent license, and without conducting any independent or additional evaluation of these individuals, Defendants Montano, Griffin and Chavez-Buie, on behalf of CYFD, prepared a one-page "Addendum to Home Study" and overturned the denial recommended by the home study.

(*Id.* ¶ 101.)  Plaintiffs further claim that in preparing this one-page "Addendum," "[t]hese Defendants bypassed established professional and legal procedures and departed from accepted professional practices and standards in making this inappropriate licensure decision."  (*Id.* ¶ 102.)

Notwithstanding these clear factual allegations – assumed to be true for purposes of the present motion – the Individual Defendants create an entirely different scenario.  In this version

"Defendants Montano, Griffin, and Chavez-Buie . . . reviewed the home study and specific concerns raised therein . . . and they made a 'team decision' following deliberation and consideration of the relevant facts." (Defs.' Mot. at 25; *see also id.* at 26 (Defendants . . . made their 'team decision' after deliberation and consideration of the relevant facts")).) This imaginary retelling of these three Defendants huddled together in deliberation and sifting through the facts is entirely at odds with the factual allegations in the complaint. Plaintiffs allege that "without conducting any independent or additional evaluation of [Vanessa and Justin], Montano, Griffin and Chavez-Buie . . . prepared a one-page "Addendum to Home Study" and overturned the denial recommended by the home study." (Am. Compl. ¶ 101.) To accept Defendants' retelling would require this Court to resolve potential factual disputes in their favor, a task entirely inappropriate on a Rule 12(b)(6) motion.

Defendants' also baldly assert that "Montano, Griffin, and Chavez-Buie did exercise professional judgment when they made the decision to license the Dominguez/Romero foster home" (Defs.' Mot. at 25), and chide Plaintiffs for not demonstrating that these Defendants "did not actually base their decision on professional judgment." (*Id.*) But the alleged facts indicate that these Defendants failed to conduct any investigation or evaluation, and merely issued a single-page "Addendum" that overturned the only home study conducted of Vanessa Dominguez and Justin Romero." (Am. Compl. ¶ 101.) Thus far in this litigation, there is no record as to what these Defendants did to prepare their statement, what factors they considered, or even how long it took them to prepare it. The plausible and reasonable inference is that this superficial add-on was not based on professional judgment. This conclusion is likely to be confirmed by discovery into the frequency and propriety of CYFD's use of a simple "Addendum" to overturn the reasoned recommendation of a Licensed Independent Social Worker (Am. Compl. ¶ 21) and

mandate a licensure decision.   The more atypical and infrequent this practice is, the more arbitrary it appears – further showing these Defendants' abdication of professional judgment.

> **b.      Placement of the Children in the Dominguez/Romero Foster Home**

The Complaint sets out any number of clear and significant lapses in professional judgment by the Individual Defendants regarding CYFD's decision to place Plaintiffs – children in the State's physical and legal custody – in the Dominguez/Romero foster home.   The allegations, accepted as true and viewed in the light most favorable to Plaintiffs, show that whatever thought was given to this placement decision by the Individual Defendants was not based on professional judgment.

As an initial matter, because of their exposure to drugs in utero, at least two of the children (Ariza Barreras and T.B.) should have been classified as "special needs" children.  (Am Compl. ¶¶ 19 & 104.)   This unique status is an essential fact with regard to the improper and unprincipled placement of these children in the Dominguez/Romero foster home.

First, "[t]he CYFD documents pertaining to Vanessa Dominguez and Justin Romero do not contain any record that either of them received any training or instruction of any kind to qualify them to treat or care for 'special needs' foster children in CYFD's legal and physical custody."  (*Id.* ¶¶ 29 & 104).   And during the 10-month period before they became foster parents for Plaintiffs, neither Vanessa Dominguez nor Justin Romero ever served as foster parents for "special needs" children.  (*Id.* ¶ 39.)   The significant question as to whether these two individuals were qualified and adequately trained to handle "special needs" children is exacerbated by the fact [t]he CYFD file contains no record of what factors . . . Defendants Hill and Valdez used in making the decision to place Ariza Barreras, T.B. and F.B. in the foster home of Vanessa Dominguez and Justin Romero in May 2017."  (*Id.* ¶¶ 40 & 104.)   The fact that these Defendants

chose not to list or identify the factors on which they may have relied establishes that there is nothing to show that they based this decision on any form of professional judgment.

Similarly, Vanessa Dominguez and Justin Romero only ever wanted to serve as respite – not full-time – foster parents.  They expressly indicated this limitation on their application for a foster parent license (*Id.* ¶ 20).  And in their "team decision" to overturn the recommendation of the home-study investigator, Defendants Montano, Griffin and Chavez-Buie acknowledged that "Justin and Vanessa would just like to be respite providers."  (*Id.* ¶ 26.)  Consistent with this fact, the one and only license issued by CYFD and signed by Defendant Griffin states that it is for only a respite home.  (*Id.* ¶¶ 27-28 & 38.)  Nonetheless, Defendants Hill and Valdez made the decision to place Plaintiffs in the full-time care of these respite foster parents.  (*Id.* ¶¶ 37 & 103.) They made that selection without providing any record to support their decision to place three young children in the full-time care of a couple who had made clear their desire not to provide this level of care.  And they made this unilateral placement decision without indicating what, if any, steps they took "to evaluate the safety, adequacy or suitability" (*id.* ¶ 41) of a respite care home to serve as the full-time residence for three children, two of whom should have been classified as "special needs" children.  The absence of any reviewable record to support a child-placement decision is clear evidence of the lack of professional judgment.  *See Valdez v. Varela*, 186 F. Supp. 3d 1197, 1276 (D.N.M. 2016) (finding complaint sufficiently alleged that social worker abdicated his professional judgment by placing children without evaluating the home or the caretaking abilities of the placement parent).

These allegations demonstrate a reasonable prospect of success on the issue whether the Individual Defendants abdicated their professional judgment.  They also make clear that discovery focused on these Defendants' decision-making process, on the actual steps they took to

assure the safety and well-being of the children, and on whether failing to create any record detailing a child-placement decision comported with CYFD practice and procedure, holds a strong prospect of garnering evidence to support this claim.  *See Matthews*, 889 F.3d at 1149 ("What the rules of notice pleading call for is a complaint alleging enough facts to raise a reasonable expectation that discovery will reveal evidence that a constitutional violation has in fact occurred.")

### c.      Licensure Approval of the Crownover Foster Home

Defendants Montano and Griffin contend that although they were responsible "for the home study of Stephanie Crownover as part of the decision to approve the license for Crownover to serve as a foster parent" (Defs.' Mot. at 28), there are no "particularized facts to show that either Defendant . . . are the individuals who made the decision to approve the license for the Crownover home."  (*Id.* at 30.)  These Defendants thus claim that although they performed the home study on which the licensure decision was based, because they did not actually make the final licensure decision or sign the physical license, they cannot be held accountable.  Such is not the law.  The Tenth Circuit foreclosed this kind of superficial argument in *Schwartz v. Booker*, 702 F.3d 573 (10th Cir. 2012), when it ruled against two state social workers who claimed that because "neither of them personally participated in the placement of" the foster child, they "did not deprive him of his liberty."  *Id.* at 581.  The appellate court held "the special relationship exists between the State and the foster child, which triggers an accompanying, continuing duty imposed on state custodial officials thereafter – not a duty limited to the specific individual who executed the placement of the child."  *Id.* (footnote omitted).  Defendants Montano and Griffin performed the Crownover home study, and their professional judgment in doing so thus properly is at issue.

Not only is the legal premise for these Defendants' argument wrong, the factual basis they assert is equally faulty.  Defendants state that "[t]here are no allegations that the home study conducted and prepared by Defendant Montano and approved by Defendant Griffin was in any way improper . . . or was in any way a failure to exercise professional judgment."  (Defs.' Mot. at 29; *see also id.* at 30 ("[t]here are no allegations that Defendant Montano did not exercise professional judgment in conducting the home study").)  This bald assertion is directly contrary to Plaintiffs' well-pled allegations.

Plaintiffs clearly allege that "Crownover was not qualified to serve as a foster parent, and never should have been allowed to serve as a foster parent for Ariza Barreras, T.B. or F.B." (Am. Compl. ¶ 114.)  Plaintiffs support this claim with detailed facts – any one of which should have served as a red-flag to a state social worker that Crownover was not fit to serve as a foster parent in any capacity.  In particular,

- Crownover's financial condition was so precarious that the home study evaluator noted, "[t]he income is barely enough to meet the family's needs."

- Crownover had an extensive criminal history, including an arrest for battery against her own six-year old granddaughter.

- Crownover admitted to a history of unsuccessful relationships with men who were emotionally abusive, who used narcotics, and at least one who sexually abused one of her daughters.

- Crownover related a history of alcohol and drug abuse and associating with dangerous social groups who were involved in criminal activity.

- Crownover had a history with CYFD which included two investigations that were substantiated – one for inadequate food and shelter and one for excessive and inappropriate discipline against Crownover.

(*Id.* ¶¶ 31(A)-(E).)

Defendant Montano was aware that, at the time of the home study, the home lacked necessary bedding for the rooms she intended to use for foster child placement. (*Id.* ¶¶ 31(H).) Although Crownover reported that she planned to buy two twin beds for one room and keep a full bed in the other room (*id.*), in fact, at the time of Ariza Barrera's death, "Crownover did not have a playpen or any adequate bedding in which Ariza Barreras could sleep." (*Id.* ¶ 66; *see id.* ¶ 69.) There are no records demonstrating that either Defendant Montano or Griffin ever went inside Crownover's home to verify whether she followed through with this plan.

Similarly, several months before Defendant Montano performed her home study, Crownover completed a SAFE Questionnaire.   There, Crownover gave significantly different information from what she subsequently revealed in the CYFD home study.   For example, Crownover denied that she ever had been emotionally abused, denied that she had ever been suspected of or investigated for physical or emotional child abuse, and denied that she had been arrested for a criminal offense.  (*Id.* ¶ 33.)  Yet there is nothing in the CYFD records showing that either Defendant Montano or Griffin were aware of these inconsistencies or made any effort to reconcile or explain these discrepancies before completing the home study.  (*Id.* ¶ 34.)

Based on these factual assertions – and directly contrary to Defendants' statement in their motion – Plaintiffs allege that "Defendants Montano and Griffin ignored pertinent information of which they were aware . . . indicating that Crownover was unfit to serve as a foster parent in any capacity . . . bypassed established professional and legal procedures and departed from accepted

professional practices and standards in making this inappropriate licensure decision in October 2016.  (*Id.* ¶ 115.)  These well-pleaded facts are assumed to be true, not the alternative version put forward by Defendants.  And at this point in the proceedings, the Court's function is only to test the sufficiency of the complaint, not to weigh conflicting versions of the facts.

Perhaps any number of would-be foster parents are approved by CYFD social workers and their supervisors who display similarly alarming and likely disqualifying characteristics. The clearly-pled and specific allegations outlining the deficiencies in Crownover's application and home study indicate further scrutiny is warranted as to whether the evaluation performed by Defendant Montano and approved by Defendant Griffin was based on some level of accepted standards or practice or amounted to a substantial departure from professional judgment.

### d.      Respite Placement in the Crownover Foster Home

Accepting the truth of Plaintiffs' factual allegations and construing all inferences in Plaintiffs' favor (as this Court is required to do in considering the present motion to dismiss), Plaintiffs have stated a plausible claim for relief related to the children's placement in respite care in the Crownover foster home.  Defendants' primary argument to the contrary is that, with regard to this placement, "there are no allegations that any individual Defendant failed to exercise professional judgment in make the decision to place the children with Crownover for respite care." (Defs.' Mot. at 31.)  This superficial assertion ignores the detailed factual context surrounding this placement.

The normal practice for foster parents to secure respite care for children in their charge was for them to contact a CYFD social worker like Defendant Montano who "then would arrange for a State-licensed respite foster parent to care for the foster children placed with" full-time foster parents like Vanessa Dominguez and Justin Romero.  (Am. Compl. ¶ 44.)

Specifically with regard to Defendant Montano, once she had been contacted, she then "would provide the paperwork necessary to document the temporary placement and to assure that the respite foster parent received compensation from CYFD." (*Id.*)

Contrary to this CYFD policy and procedure, Defendant Montano had personal knowledge that Vanessa Dominguez and Justin Romero were arranging for respite care with Crownover on their own and without CYFD's prior knowledge or approval. (*Id*. ¶¶ 47-48.) "Although inconsistent with CYFD's policies and procedures, Defendant Montano never told Vanessa Dominguez and Justin Romero that they could not follow this practice or that this routine was in any way improper." (*Id*. ¶ 48.) Dominguez and Romero utilized this unauthorized procedure to secure respite care for all three children in December 2017. (*Id*. ¶ 59.) Once again, contrary to Defendants' bare statement in their motion, Plaintiffs directly allege that "[b]y knowingly allowing Vanessa Dominguez and Justin Romero to bypass and violate CYFD policies and procedures governing the proper manner for securing respite care for children in the state's legal custody, Defendant Montano ignored established professional and legal procedures and departed from accepted professional practices and standards." (*Id*. ¶ 130.)

Defendant Montano knew that the full-time foster parents selected by CYFD were not following CYFD policies governing the placement of foster children in respite care. Defendant Montano knew this fact, allowed it to keep happening and never questioned it or took steps to stop it. In short, Defendant Montano knowingly delegated her lawful authority to make respite care placement decisions to the children's foster parents in contravention of CYFD policy. Thus, although Defendant Montano did not personally place the children in Crownover's care, she knowingly allocated that responsibility to the children's foster parents who were not authorized to make this decision. These allegations both present a plausible theory of relief and "raise a

reasonable expectation that discovery will uncover proof of [Plaintiffs'] claims." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 788-89 (3rd Cir. 2016).  *See C.H. v. Los Lunas Sch. Bd. of Educ.*, 852 F. Supp. 2d 1344, 1361 (D.N.M. 2012) (Plaintiffs "need only allege facts which make it plausible that a jury could find in [their] favor and the Court need not decide what action the Defendants should have taken – which is a question of fact.")

This non-authorized delegation of respite care placement authority clearly sets forth Defendant Montano's total abdication of professional judgment.  Moreover, such abandonment of her professional duties was highlighted by the fact that in October 2017 – two months before Ariza Barreras died while in Crownover's care – Crownover had made abundantly clear that she no longer was willing to care for F.B. and T.B. at the same time.  (Am. Compl. ¶ 51.)  Defendant Montano knew this fact and recorded it in her file on several occasions.  (*Id.* & ¶ 55.) Nonetheless, on December 28, 2017, "[d]espite Crownover's repeated statements to Dominguez and Defendant Montano . . . that she no longer would provide respite care for Ariza Barreras, T.B. and F.B. together, Crownover agreed to accept all three children for respite care.  (*Id.* ¶ 60.) Had Defendant Montano performed her job and required that all requests for respite care be pre-arranged through her in accordance with CYFD practice and policy, then Defendant Montano would have had the opportunity and authority to prevent all three children from being placed into Crownover's care.  The complaint sets out a plausible claim that Defendant Montano's knowing failure to act amounted to a complete failure to exercise any professional judgment.

Finally, Defendants Montano and Griffin assert that there is nothing to show a failure to exercise professional judgment because, before December 2017, they had contacts with Crownover and had no concerns about either the Crownover home or Crownover's respite care. (Defs.' Mot. at 32.)  This statement is belied by numerous allegations set forth in the complaint.

First, other foster parents who had utilized Crownover to provide respite care noted significant problems with her as a respite care provider, including that children were dirty and that Crownover failed to attend to a child's medical needs.  (Am. Compl. ¶ 52).  These "foster parents reported these incidents to Defendant Montano."  (*Id.* ¶ 53.)  Defendant Montano thus had personal knowledge of complaints related to Crownover as a respite care provider. Nonetheless, "[t]he CYFD files . . . do not contain any contemporaneous records of these reports or any investigation undertaken by Defendant Montano. . . ."  (*Id.* & ¶ 116.)

More importantly, although both Defendants Montano and Griffin supposedly had numerous contacts with Crownover during the fall of 2017, neither of them ever recorded any concerns about the condition of the Crownover home.  For example, neither of these Defendants ever noted that that despite Crownover's promise at the time of the home study, at the time of Ariza Barrera's' death, "[t]he Crownover's house did not have a crib or proper bed for an 11 month old child."  (*Id.* ¶ 69(B).)   It further strains all credibility that despite their claimed frequent interactions with Crownover and her home, they failed to note the vile and deplorable condition of the Crownover home at the time Ariza Barreras died in December 2017.  (*See id.* ¶¶ 69(C)-(F) (setting forth the details of law enforcement's investigation of the Crownover home).)

As Defendants Montano and Griffin concede (Defs.' Mot. at 32), both of them failed contemporaneously to enter their notes about their supposed numerous contacts with Crownover and her home – some taking place as late as one month before Ariza Barreras' death.  (*See* Am. Compl. ¶¶ 54 & 56.)   Given the shocking discrepancy between these Defendants' upbeat observations and the appalling state of the Crownover home at the time of the death, Plaintiffs' allegations plausibly suggest that whatever inspection these Defendants may have performed of the Crownover home (if any) fell far below any standard of accepted professional judgment.

Even if "the Court cannot determine whether the facts will ultimately demonstrate that such conduct violates professional standards, . . . Plaintiffs have plausibly alleged that [these Defendants] abdicated [their] professional judgment." *Valdez*, 186 F. Supp. 3d at 1275.

e.        **Monitoring the Crownover Foster Home**

Although divided into a separate section, much of the Individual Defendants' motion related to "monitoring of Crownover foster home" mirrors the portion of the motion related to "respite placement in Crownover foster home." (*Compare* Defs.' Motion at 31-32 *with* 32-37.) The basic thrust of both portions is that because of their contacts with Crownover before Ariza Barreras' death and their findings that they had no concerns about the home, there are insufficient allegations to show that either Defendant Montano or Griffin failed to exercise professional judgment. This assertion lacks merit in light of the significant and detailed allegations set forth in the complaint.

First, Plaintiffs provided specific allegations regarding concerns about Crownover as a respite care provider communicated to Defendant Montano by other foster parents who also used her to provide respite care. Several of these foster parents noted significant problems with Crownover as a respite care provider, including that children were dirty and that Crownover failed to attend to a child's medical needs. (Am. Compl. ¶ 52.) These "foster parents reported these incidents to Defendant Montano." (*Id.* ¶ 53.) "Despite the fact that several foster parents who used Crownover to provide respite care reported significant problems with Crownover as a respite care provider to Defendant Montano, she failed to enter these complaints in the CYFD records on a contemporaneous basis and did not investigate these claims." (*Id.* ¶ 116.) Thus, even though Defendant Montano had personal knowledge of complaints related to Crownover as a respite care provider, she took no action to investigate. In fact, "[t]he CYFD files . . . do not

- 23 -

contain any contemporaneous records of these reports or any investigation undertaken by Defendant Montano. . . .” (*Id.* ¶ 53.)   Future discovery may well reveal that Defendant Montano's actions violated professional standards.  *See Johnson ex rel. Estate of Cano v. Holmes*, 455 F.3d 1133, 1145 (10th Cir. 2006) (summary judgment improper when expert testified that defendant social worker's failure to investigate changes in the child's home constituted "an abandonment of professional judgment").

Second, Plaintiffs provided specific allegations about Defendant Montano's personal knowledge about Crownover's respite care for Ariza Barreras, T.B. and F.B.  In the fall of 2017 – months before Ariza Barreras died while in Crownover's care – Crownover made clear that she no longer was willing to care for F.B. and T.B. at the same time.  (Am. Compl. ¶ 51.)  Defendant Montano knew this fact, as her "notes reflect that in both September and October 2017, Crownover informed her that she would not provide respite care for Ariza Barreras, T.B. and F.B. together." (*Id.* ¶ 55.)  Nonetheless, on December 28, 2017, "[d]espite Crownover's repeated statements to Dominguez and Defendant Montano . . . that she no longer would provide respite care for Ariza Barreras, T.B. and F.B. together, Crownover agreed to accept all three children for respite care.  (*Id.* ¶ 60.)  Despite knowing that Crownover no longer could care for all three children together, Defendant Montano took no action to prevent precisely this respite placement from occurring; a placement which resulted in Ariza Barreras' death and injury to T.B. and F.B. The complaint sets out a plausible claim that the absence of any action by Defendant Montano amounted to a total failure to exercise any professional judgment.  *See Schwartz*, 702 F.3d at 586 (finding that plaintiffs properly alleged deviation from professional judgment based on a showing that defendant social workers failed properly to investigate).

Third, Plaintiffs provided specific allegations about the quality and quantity of home monitoring supposedly performed by Defendants Montano and Griffin. Both Defendants Montano and Griffin claim they had numerous contacts with Crownover during the fall of 2017, and that neither of them ever recorded any concerns about the condition of the Crownover home. (*See* Am. Compl. ¶¶ 54 & 56.) For example, neither of these Defendants ever noted that that despite Crownover's promise at during the home study performed in September 2016, at the time of Ariza Barreras' death, "[t]he Crownover's house did not have a crib or proper bed for an 11 month old child." (*Id.* ¶ 69(B).) More importantly, despite their claimed frequent interactions with Crownover and her home – including roughly one month before Ariza Barreras died – neither Defendant Montano nor Griffin ever noted the vile and deplorable condition of the Crownover home at the time Ariza Barreras died in December 2017. (*See id.* ¶¶ 69(C)-(F) (setting forth the details of law enforcement's investigation of the Crownover home).) This failure to make any notation of the sights and odors that law enforcement described as "'awful,' 'almost unbearable,' and 'intolerable'" (*id.* ¶ 69(F)), raises significant questions about the professional manner in which these Defendants performed their investigations.

Both Defendants Montano and Griffin concede (Defs.' Mot. at 32) that they failed contemporaneously to enter their notes about their supposed numerous contacts with Crownover and her home. (*See* Am. Compl. ¶¶ 54 & 56.) Given the stunning incongruity between these Defendants' findings of "[n]o concerns" about the Crownover home and the shocking state of the residence at the time of the death only 30 days later, Plaintiffs' allegations plausibly suggest that whatever inspection these Defendants may have performed of the Crownover home (if any) fell far below any standard of accepted professional judgment. Even if "the Court cannot determine whether the facts will ultimately demonstrate that such conduct violates professional standards, .

. . Plaintiffs have plausibly alleged that [these Defendants] abdicated [their] professional judgment." *Valdez*, 186 F. Supp. 3d at 1275.

Fourth, Plaintiffs provided specific allegations about Crownover's conduct in the days immediately before Ariza Barreras' death.   On December 29, 2017 – once they were in Crownover's respite care – the children had a supervised visitation with their biological parents. (Am. Compl. ¶ 62.)  During that visit, not only was Crownover late, but "[w]hen she arrived with the children, neither F.B. nor T.B. were wearing socks."  (*Id.* ¶ 62(A).)  More disturbingly, the supervised monitor found that "Ariza was wearing a diaper that had been soiled for well over an hour" and "had a red rash surrounding her vagina and on her upper thighs and dried feces on her buttocks and lower back."  (*Id.* ¶ 62(B).)  In addition, "F.B. had diaper rash, including a red rash on his testicles that extended down the inside of his left thigh."  (*Id.*)  "The visitation monitor recorded all of these findings and transmitted them to CYFD."   (*Id.* ¶ 62(C).)  There is nothing in the CYFD file to show that anyone "contacted Crownover about these findings or sought to investigate them in any way."  (*Id.*)  Whether any Individual Defendant had actual knowledge of this report will be determined in discovery.  The specific allegations plausibly state a claim for failing to exercise professional judgment, no matter whether that discovery ultimately supports the claim that these Defendants violated professional standards by not acting in a timely manner,

Finally, Plaintiffs provided specific allegations about an occurrence involving Crownover of which both Defendants Montano and Griffin had personal knowledge.  On November 30, 2017 – only one month before Ariza Barreras died – Defendant Montano spoke with Crownover about "'an unspecified "incident' which Defendant Montano said 'was against policy in the Memorandum of Agreement and that it was unacceptable.'  Defendant Montano's notes further reflect that she told Crownover that CYFD 'would be looking at some type of corrective action

- 26 -

plan.'" (*Id.* ¶ 55.)  On that same day, Defendant Griffin made note that she had "[s]taffed with Leah [Montano] regarding the concerns in the above mentioned email.  Leah will address with Stephanie [Crownover] and put her on a corrective action plan ASAP.  Leah typed up the plan [Defendant Griffin] reviewed and now Leah can meet with Stephanie to review."  (*Id.* ¶ 56(B).) Defendants dismiss this allegation, stating that "[t]here are no facts to show that the November 2017 incident involved any safety issues or concerns with the Crownover home . . . ."  (Defs.' Mot. at 36.)  At this early stage of the proceedings, however, Plaintiffs lack knowledge or access to evidence to show what this incident did involve.  But the fact remains that this "incident" occurred very near in time to when three foster children were harmed while in Crownover's care, was serious enough to be found "unacceptable," and warranted a "corrective action plan."  Such level of detail gives fair notice to enable these Defendants to defend themselves; "[w]hether the evidence supports those allegations is a question for further proceedings."  *Colbruno v. Kessler*, 2019 U.S. App. LEXIS 19768 (10th Cir. July 2, 2019) (affirming denial of motion to dismiss on grounds of qualified immunity).

### C.    The Individual Defendants' Conduct Caused Plaintiffs' Injuries.

The Individual Defendants contend that Plaintiffs failed to allege a sufficient causal connection between their conduct and the injuries suffered by Ariza Barreras, T.B. and F.B. More specifically, because "[t]here simply are no facts to show that it was foreseeable to any Defendant" that Plaintiffs would be harmed, the Individual Defendants argue that "Plaintiffs cannot show *a constitutional* deprivation and qualified immunity is warranted for all Defendants."  (Defs.' Mot. at 45.)  The Individual Defendants' myopic view of causation does not withstand scrutiny.

To impose liability under Section 1983, "'[t]he requisite causal connection is satisfied if Defendants set in motion a series of events that Defendants knew or reasonably should have known would cause others to deprive Plaintiffs of their constitutional rights." *Martinez v. Carson*, 697 F.3d 1252, 1255 (10th Cir. 2012) (quoting *Trask v. Franco*, 446 F.3d 1036, 1046 (10th Cir. 2005).)  "As numerous courts of appeals have recognized, individual liability for a government official who violates constitutional rights . . . turns on traditional tort principles of 'but-for' causation." *Sims v. City of Madisonville*, 894 F.3d 632, 639 (5th Cir. 2018) (citing cases).  *See Martinez*, 697 F.3d at 1255 (state officials may be held liable if constitutional deprivation "would not have occurred but for their conduct").  From any number of perspectives, Plaintiffs unquestionably lay out an unmistakable pattern of acts and omissions that led to the death of Ariza Barreras and the injuries of T.B. and F.B.

But-for the inappropriate "team decision" of Defendants Montano, Griffin and Chavez-Buie, Vanessa Dominguez and Justin Romero would not have been licensed as foster parents. This improper action, made without any independent or additional evaluation, overturned the denial recommended by the independent agency that performed an extensive and well-documented home study.  (*See* Am. Compl. ¶¶ 21-24 & 101-102.)  And had CYFD never licensed the Dominguez/Romero foster home, Ariza Barreras, T.B. and F.B. never would have been placed in their care.  Moreover, even if licensed, but-for the undocumented and unsupported decision by Defendants Hill and Valdez to place "special needs" children with  two individuals who lacked specialized training and who did not want, and were not licensed, to provide full-time foster care, these children would not have been placed in the Dominguez/ Romero foster home.  (*Id.* ¶¶ 40-42 & 107.)

But-for the inadequate home study performed by Defendants Montano and Griffin which ignored and overlooked any number of alarming and disqualifying characteristics, Crownover never would have become a state-licensed respite care worker. (*Id.* ¶ 31.) And had she not been allowed to care for foster children in the State's physical and legal custody, Ariza Barreras, T.B. and F.B. never would have been placed in her care in December 2017.

Even after Dominguez and Romero improperly were licensed as foster parents, and even after Crownover inexplicably was allowed to serve as a respite care foster parent, but-for Defendant Montano's knowing and unauthorized delegation of authority to make respite care placement decisions to foster parents, the children would not have been in Crownover's care in December 2017. (*Id.* ¶¶ 47-48; 59 & 130.) This fact is all the more certain given Defendant Montano's personal knowledge that Crownover no longer wished to care for all three children. (*Id.* ¶¶ 55 & 60.) Had Defendant Montano performed her job and required that all requests for respite care be pre-arranged through her in accordance with CYFD practice and policy, then Defendant Montano would have had the opportunity and authority to prevent all three children from being placed into Crownover's care.

And but-for the lackadaisical and perfunctory monitoring of the Crownover foster home by Defendants Montano and Griffin, Ariza Barreras and her siblings would not have been placed there for respite care in December 2017. Defendant Montano had personal knowledge related to problems with Crownover's respite care reported by other foster parents and took no action. (*Id.* ¶¶ 52-43.) Defendant Montano had direct knowledge that Crownover no longer wanted to care for all three children and did nothing to stop this placement. (*Id.* ¶¶ 55 & 60.) And although Defendants Montano and Griffin claimed to have no concerns about the Crownover home, their perceptions seem entirely to have overlooked the deteriorating and alarming physical condition

of this residence.  (*Id.* ¶¶ 56 & 69(C)-(F).)  But-for these Defendants' failure to monitor the Crownover respite foster home in a professional manner, Ariza Barreras, T.B. and F.B. would not have been in Crownover's home in December 2017.

Plaintiffs' properly pled allegations showing that each of the Individual Defendants were essential parts of an inevitable and predictable chain of events that culminated in the death of an 11-month old infant and the injuries to her two siblings.  Plaintiffs properly alleged "[t]he requisite causal connection," *Martinez*, 697 F.3d at 1255, between the actions and omissions of the Individual Defendants and the deprivation of Plaintiffs' constitutional rights.

### D.      The Individual Defendants' Conduct Is Truly Conscience Shocking

The Individual Defendants contend that in order for their conduct to be "conscience shocking" their conduct must be so outrageous as to "shock the conscience" of the court.  (*See* Defs.' Mot. at 8, 37-40).  Contrary to Defendants' circular reasoning, the question of what conduct tends to shock the conscience is not so simplistically determined.

"To show a defendant's conduct is conscience shocking, a plaintiff must prove a government actor arbitrarily abused his authority or employed it as an instrument of oppression." *Hernandez v. Ridley*, 734 F.3d 1254, 1261 (10th Cir. 2013) (internal quotation marks & citation omitted) (alteration omitted).  Contrary to the Individual Defendants' view, the kind of behavior that satisfies this standard defies precise definition.  There is "no calibrated yard stick" by which conscience shocking behavior can be measured; instead, it depends on the circumstances of each case.  *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998); *see Koessel v. Sublette Cnty. Sheriff's Dep't*, 717 F.3d 736, 750 (10th Cir 2013).   And whether such behavior shocks the conscience is a function of the defendant's "conduct as whole."  *Uhlrig v. Harder*, 64 F.3d 567, 576 (10th Cir. 1995); *Schwartz*, 702 F.3d at 586 ("Viewing [social workers'] conduct 'in total'"

- 30 -

and finding allegations to be conscience shocking).  "This includes both action and inaction." *Estate of B.I.C. v. Gillen*, 710 F.3d 1168, 1174 (10th Cir. 2013).

The "[r]ules of due process are not . . . subject to mechanical application in unfamiliar territory."  *Cnty. of Sacramento*, 523 U.S. at 850.  When unique fact patterns raise novel applications of constitutional principles – as does the present case – what shocks the conscience "must necessarily evolve over time from judgments as to the constitutionality of specific government conduct."  *Uhlrig*, 64 F.3d at 574.  For this reason, the Court's analysis of whether the alleged behavior is, in fact, conscience-shocking should depend "on further context as provided by discovery," rather than on competing claims raised in a motion to dismiss.  *Currier v. Doran*, 242 F.3d 905, 920 (10th Cir. 2001); *see also Schwartz*, 702 F.3d at 587 ("Of course, discovery may inform the context of [the defendants'] actions such that their behavior was not conscience-shocking."); *Armijo v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1264 (10th Cir. 1998) ("[S]uch conduct, if true, when viewed in total, possible could be construed as conscience-shocking, depending on context as determined after a full trial.").[1]

---

[1] Based on similar concerns, several circuit courts have expressed a preference for qualified immunity claims to be resolved on motions for summary judgment after some modicum of discovery rather than on motions to dismiss.  As noted by the Sixth Circuit in *Wesley v. Campbell*, 779 F.3d 421, 433-34 (6th Cir. 2015) "[It is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity.  Although an officer's entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point, that point is usually summary judgment and not dismissal under Rule 12") (internal quotation marks & citation omitted).  *See Chesser v. Sparks*, 248 F.3d 1117, 1121 (11th Cir. 2001) ("[Q]ualified immunity is typically addressed at the summary judgment stage of the case"); *Jacobs v. City of Chicago*, 215 F.3d 758, 775 (7th Cir. 2000) (Easterbrook, J., concurring) ("Rule 12(b)(6) is a mismatch for immunity and almost always a bad grounds for dismissal"); *Rellergert v. Cape Girardeau Cty.*, 924 F.2d 794, 796 (8th Cir. 1991) ("To provide its fullest and best use, qualified immunity ideally is addressed at summary judgment"); *Warren v. Dwyer*, 906 F.2d 70, 76 (2nd Cir. 1990) ("The better rule . . . is for the court to decide the issue of qualified immunity as a matter of law, preferably on a motion for summary judgment . . . or on a motion for directed verdict"); *see also Irish v. Maine*, 849 F.3d 521, 523 (1st Cir. 2017)

The Individual Defendants' reckless and deliberate actions and omissions in abdication of their professional judgment concerning the State's exercise of custodial power over Ariza Barreras, T.B. and F.B. shock the conscience. Defendants' claims to the contrary disregard the complaint's well-pleaded factual allegations, which this Court is required to accept as true. *See Casanova*, 595 F.3d at 1124.

Defendants first assert that there were "no reports of . . . any safety concerns while [the children] were in the foster home of Vanessa and Justin." (Defs.' Mot. at 39.) This facile assertion ignores the myriad of specific facts set forth in the complaint that question whether these individuals ever should have been licensed as foster care parents and whether Ariza Barreras, T.B. and F.B. ever should have been placed in their care.

"Neither Vanessa Dominguez nor Justin Romero were qualified to serve as foster parents." (Am. Compl. ¶ 99.) As previously detailed, *supra*, 11-14, the agency specifically selected by CYFD to conduct the only home study of Vanessa Dominguez and Justin Romero expressly recommended that CYFD deny them a foster parent license. Despite the numerous facts revealed in the 18-page home study, and without conducting any independent or additional evaluation of these individuals, Defendants Montano, Griffin and Chavez-Buie prepared a perfunctory, one-page "Addendum to Home Study" and overturned the recommended denial. These Defendants ignored pertinent information indicating that Vanessa Dominguez and Justin Romero were unfit to serve as foster parents, bypassed established professional and legal procedures and departed from accepted professional practices and standards in making this inappropriate licensure decision in July 2016. (Am. Compl. ¶¶ 100-101.) And solely because of these Defendants' actions, the State of New Mexico licensed the Dominguez/Romero foster

---

(vacating order granting qualified immunity motion to dismiss and remaining for discovery on relevant facts)

home.  Defendants engaged in this conduct with the direct knowledge that vulnerable young children would be placed into this home and would rely on Dominguez and Romero for their safety and well-being.

These Defendants willfully chose not to conduct any investigation or evaluation.  As a result, there is no record as to what these Defendants did to prepare their statement, what factors they considered, or even how long it took them to prepare it.  Such unilateral and standardless conduct is the very kind of arbitrary abuse of state authority that shocks the conscience.

Beyond their improper licensure, "[n]either Vanessa Dominguez nor Justin Romero "should have been selected to serve as foster parents for Ariza Barreras, T.B. or F.B."  (*Id.* ¶ 99.) As detailed above, *supra*, 14-16, Defendants Hill and Valdez compounded the unacceptable and improper licensure decision by orchestrating the placement of Ariza Barreras, T.B. and F.B. with Vanessa Dominguez and Justin Romero to serve as their full-time foster parents.  They made this placement decision even though the only license issued to the Dominguez/Romero foster home by CYFD was the July 2016 license limited to respite care.  Defendants Hill and Valdez made this placement decision without making any record of the factors used to determine that placing Ariza Barreras, T.B. and F.B. in the Dominguez/Romero foster home in May 2017 was in the best interest of the children.  These Defendants placed the children with Vanessa Dominguez and Justin Romero and allowed them to stay in their full-time care without taking any steps to evaluate, assess or otherwise determine whether any of the children should have been treated and cared for as "special needs" children and placed with foster parents who had received the additional training required to serve as foster parents for "special needs" children in state custody.  (*See id.* ¶¶ 103-104.)

The absence of any one of these records is evidence of a pronounced lack of professional judgment.  That any indicia of any kind of investigation are missing demonstrates a reckless and conscious disregard of an obvious risk of serious harm.  Moreover, "these allegations, while perhaps not conscience shocking on their face, render it plausible that [these Defendants] failed to exercise professional judgment regarding a conscience-shocking situation."  *Matthews*, 889 F.3d at 1149.  Such a showing "raise a reasonable expectation that discovery will reveal evidence that a constitutional violation has in fact occurred."  *Id.*

For example, discovery related to the frequency in which CYFD made full-time foster care placement decisions in a similar, standardless, manner will highlight whether this practice was within professional standards.  The more atypical and infrequent this practice may be, the more arbitrary it may appear – a factor recognized by the Tenth Circuit as a relevant consideration in measuring whether government conduct is conscience shocking.  *See Radecki v. Barela*, 146 F.3d 1227, 1229 (10th Cir. 1998); *see generally DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1196-98 (10th Cir. 2010) (constitutional injury to children in foster care includes not just actual abuse and neglect, but the impermissible risk of harm or abuse and neglect due to alleged systemic failures of child welfare agency).

Second, discovery is appropriate with regard to the motivation for Defendants Hill and Valdez's unilateral actions:  were they (as Plaintiffs alleged) acts of deliberate indifference to the welfare and well-being of Ariza Barreras and her siblings, or were they caused by these Defendants' actual knowledge that the children would be in a better place in the Dominguez/Romero foster home?

Beyond the Dominguez/Romero foster setting, Defendants also claim that "[t]here are no facts to show that any Defendant . . . ignored any supposed danger posed by the children's

respite placement in Crownover's home."  (Defs.' Mot. at 40.)  The only way to accept this assertion is for the Court to disregard the allegations of the complaint, and instead draw factual inferences based on the arguments asserted by defense counsel in motion.  Such reasoning flies in the face of this Court's obligation to accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to Plaintiffs, and draw all inferences in Plaintiffs' favor.  *See Casanova*, 595 F.3d at 1124; *Smith*, 561 F.3d at 1098.  Viewing the Individual Defendants' "conduct as whole."  *Uhlrig*, 64 F.3d at 576, Plaintiffs allege a myriad of facts all of which demonstrate that the Individual Defendants consistently and repeatedly ignored these precise dangers to Ariza Barreras, T.B. and F.B.

Ariza Barreras was pronounced dead in the Crownover foster home on December 31, 2017.  (Am. Compl. ¶ 68.)  Within 24 hours after her death, CYFD investigators found, based on "sufficient, credible, reasonable believable information" that "[a] household member has previously abused or neglected a child(ren), and the severity of the maltreatment, or the caregiver(s) response to the prior incident, places the child(ren) in present or impending danger of serious harm; and [the household environment or living conditions place the child(ren) in present or impending danger of serious harm."  (*Id.* ¶ 74.)  If these investigators could identify these dangers less than a day after the children were harmed, then it clearly is plausible that this same information was known (or at the very least, should have been known) to the Individual Defendants with direct personal involvement in overseeing Crownover's respite care.  These allegations plausibly demonstrate that that these Defendants, in fact, knew of the danger to Plaintiffs in the Crownover home and took no action to abate it.

This level of awareness – and the crass and reckless indifference to what these facts represented – is further supported by the considerable body of disturbing issues surrounding

- 35 -

Crownover as a respite care provider.   All of these Defendants' actions and omissions are pertinent to whether their conduct shocks the conscience.  *Schwartz*, 702 F.3d at 586 ("Viewing [social workers'] conduct 'in total'").

To start, "Crownover was not qualified to serve as a foster parent."  (Am Compl. ¶ 114.) Defendants Montano and Griffin ignored pertinent information of which they were aware, *see* supra, 16-19, indicating that Crownover was unfit to serve as a foster parent in any capacity. This included knowledge of (i) Crownover's precarious financial condition; (ii) her extensive criminal history; (iii) her history of alcohol and drug abuse and associating with dangerous social groups who were involved in criminal activity; and (iv) her history with CYFD which included two substantiated investigations for abuse.  (*Id.* ¶¶ 31(A)-(E).)

Similarly, several months before Defendant Montano performed her home study, Crownover completed a SAFE Questionnaire.    There, Crownover gave significantly different answers from what she subsequently revealed in the CYFD home study.  (*Id.* ¶ 33.)  Yet there is nothing to show that either Defendant Montano or Griffin investigated these inconsistencies or made any effort to reconcile these discrepancies before completing the home study.  (*Id.* ¶¶ 34.) The clearly-pled and specific allegations outlining the deficiencies in Crownover's application and home study indicate further scrutiny is warranted as to whether the decision by Defendants Montano and Griffin to recommend Crownover as a foster parent "was so egregious, outrageous and fraught with unreasonable risk so as to shock the conscience."  *Uhlrig*, 64 F.3d at 576.

Defendants Montano and Griffin continued to disregard relevant information about Crownover after she began serving as a state-licensed foster parent.  Despite the fact that several foster parents who used Crownover to provide respite care reported significant problems with Crownover as a respite care provider to Defendant Montano, she failed to enter these complaints

in the CYFD records on a contemporaneous basis and did not investigate these claims. Similarly, even though Defendant Montano was aware that, as of September 2017, Crownover no longer wanted to provide respite care for Ariza Barreras, T.B. and F.B. together, she failed contemporaneously to note that information; in fact, she did not enter that fact into CYFD's computer system until four days after Ariza Barreras died while in Crownover's care at a time when all three children were present.  (Am. Compl. ¶¶ 51-55 & 60.)

The fact is that Crownover never should have been allowed to serve as a foster parent for Ariza Barreras, T.B. or F.B. in December 2017.  Contrary to CYFD policy and procedure, Defendant Montano had personal knowledge that Vanessa Dominguez and Justin Romero were arranging for respite care with Crownover on their own and without CYFD's prior knowledge or approval.  (*Id*. ¶¶ 47-48.)  "Although inconsistent with CYFD's policies and procedures, Defendant Montano never told Vanessa Dominguez and Justin Romero that they could not follow this practice or that this routine was in any way improper."  (*Id*. ¶ 48.)  As a direct result of Defendant Montano's conscious inaction, Dominguez and Romero utilized this unauthorized procedure to secure respite care for all three children in December 2017.  (*Id.* ¶ 59.)  "By knowingly allowing Vanessa Dominguez and Justin Romero to bypass and violate CYFD policies and procedures governing the proper manner for securing respite care for children in the state's legal custody, Defendant Montano ignored established professional and legal procedures and departed from accepted professional practices and standards."  (*Id.* ¶ 130.)

Rather than exercise any scrap of professional judgment, Defendant Montano chose instead knowingly to delegate her lawful authority to make respite care placement decisions to the children's foster parents in clear contravention of CYFD policy.  Thus, Defendant Montano knowingly allocated that responsibility to the children's foster parents who were not authorized

to make these decision.  This complete failure to act is the very antithesis of the exercise of professional judgment.  And by choosing not to act within any known or accepted professional guidelines, Defendant Montano abused her state-granted authority in a manner that directly resulted in all three children being placed at an unreasonable risk of harm.

Plaintiffs adequately alleged that Individual Defendants failed to perform their role as state-authorized custodial agents for children in the physical and legal custody of the State of New Mexico.  Those allegations are enough to state a plausible claim for relief.  To the extent there is any question as to whether that alleged behavior is, in fact, conscience-shocking should depend "on further context as provided by discovery," rather than on competing claims raised in a motion to dismiss.  *Currier*, 242 F.3d at 920; *see Schwartz*, 702 F.3d at 587 ("Of course, discovery may inform the context of [the defendants'] actions such that their behavior was not conscience-shocking."); *Armijo*, 159 F.3d at 1264 ("[S]uch conduct, if true, when viewed in total, possible could be construed as conscience-shocking, depending on context as determined after a full trial.").

Given their young age, once they had been removed from their biological parents and were within the State of New Mexico's legal custody and physical control, Ariza Barreras, T.B. and F.B. were wholly dependent for their basic human needs on the care-givers selected for them by the State of New Mexico.  Defendants Montano, Griffin, Chavez-Buie, Hill and Valdez had a mandatory duty to ensure these children's safety and physical control, to avoid placing such children in situations of greater danger than those from which Defendants removed the children in the first place.  Rather than comply with the obligation, these Defendants violated this duty knowingly, recklessly, or with deliberate indifference and callous disregard for the children's

rights.   Their conduct is conscience shocking and falls below any acceptable level properly demanded of state officials.[2]

## CONCLUSION

For all of the foregoing reasons, the Court should deny the motion to dismiss filed by the Individual Defendants.

---

[2] As noted in Defendants' motion, nearly all of the elements necessary to state a claim under the special relationship doctrine also apply to a claim asserted under the "danger creation" doctrine. (*See* Defs.' Mot. at 8 (citing, e.g., *Robbins*, 19 F.3d at 1251).)    Thus, although Plaintiffs certainly prevail under their claims asserted under special relationship doctrine, should the Court in any way doubt whether the children were in a recognized-custodial relationship with the State, Plaintiffs plausibly set forth a claim under the alternative "danger creation" theory.

Respectfully submitted,

**MARTINEZ, HART, THOMPSON & SANCHEZ, P.C.**

By:_____*/s/ F. Michael Hart*_____.
        F. Michael Hart
        Kelly Stout Sanchez
1801 Rio Grande Blvd., NW – Suite A
Albuquerque, NM 87104
Telephone:    (505) 343-1776
Facsimile:    (505) 344-7709
E-mail:        mikeh@osolawfirm.com
                kellys@osolawfirm.com


                -and-


**RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.**

By:_____*/s/ Andrew G. Schultz*_____.
        Andrew G. Schultz
        Melanie B. Stambaugh
P.O. Box 1888
Albuquerque, NM 87103
Telephone:    (505) 765-5900
Facsimile:    (505) 768-7395
E-mail:        aschultz@rodey.com
                mstambaugh@rodey.com

*Attorneys for Plaintiff Gabrielle Valdez, as Guardian Ad Litem for T.B. and F.B., minor children*

**WILLIAMS INJURY LAW, P.C.**

By:_____*/s/ Bryan L. Williams*_____.
        Bryan L. Williams
4801 All Saints Rd NW
Albuquerque, NM 87120
Telephone:    (505) 594-4444
Facsimile:    (505) 214-5990
E-mail:        bryan@bryan4results.com

*Attorneys for Plaintiff Lee Hunt, as Personal Representative of the Wrongful Death Estate of Ariza Barreras*